Mr. Justice Hagner
delivered the opinion of the Court:
This is an appeal from rulings of the justice holding the Circuit Court upon a trial on issues from the Orphans’ Court to test the validity of a testamentary paper propounded as the last will and testament of John Hoover.
The caveatees have brought the case here upon twenty-■eight exceptions taken during the trial; and upon an appeal from the refusal of the court to set aside the verdict and .grant a new trial. The voluminous record contains a case .stated as well as the bills of exceptions.
*502 The testator was, ninety-two years of age; a widower without, children; and his near relatives and heirs at law were several nephews and nieces, most of whom are the caveators. • He had accumulated a large and. valuable estate, real and personal; but a considerable of this he had given, before the execution of the will, to institutions connected with the Roman Catholic Church (to which communion he belonged), and to one of his nieces; and to others not related to him. The only beneficiaries under the alleged will, with the exception of a few legatees not related to him, among whom were Rudolph Eichhorn, the executor and his daughters, were Roman Catholic colleges, asylums, churches and hospitals.
On a former trial, the jury rendered a verdict against the-will, which was set aside by the same trial justice; and this ruling was affirmed by this court on appeal. 7 Mackey, 541. A similar verdict for the caveators was rendered on the second trial.
Twelve only of the twenty-eight exceptions "were at all insisted on by the caveatees at the present hearing, three of which arise out of questions upon points of practice; six were taken to decisions upon evidence; and three to rulings upon the prayers. But we have nevertheless examined each exception with care, and are satisfied neither of them contains any error prejudicial to the caveatees. It is not necessary to repeat the result of our examination of^he objections urged to such of them as were argued here, as the main contest before us had reference h> the refusal of the court below to set aside the second verdict for the caveators and grant a new trial'.
Eight grounds of objections were set forth in the motion, although only the 2d, 3d, 4th,.5th, and 6th reasons were urged on' the argument. These insist there was no evidence to sustain the verdict; that it wás contrary to the evidence, and to the weight' of evidence; that it was. unreasonable, and contrary to the law, and' to'ttie'in'structibns.of the court.:
*503 In the case reported in 7 Mackey, an appeal had beeii taken by these caveators from the ruling of the trial justice setting aside the verdict of the jury in favor of the caveators and awarding, a new trial. We refused to disturb that ruling; holding that every intendment should be made in favor of the action of the trial justice, who from the nature of the case was better qualified to judge whether the verdict was "warranted by the evidence, than the appellate justices •who had not the advantage of hearing the witnesses; that on the appeal all proper allowance should be made for that circumstance, and as the record disclosed evidence that might reasonablj’ have led the trial justice to think the verdict was wrong, while declining to express our own opinion upon its force we did not discover on the face of the record such error in the action of the court below as would justify us in reversing its ruling.
In the present case, confronted as we are^by the refusal of the same justice to set aside a second verdict in favor of the caveators, we consider ourselves bound, upon the same general principles to sustain the action of the court below, unless upon an examination of the entire record we shall be satisfied there was clearly a legal insufficiency of evidence to sustain the verdict. It is in no degree requisite to the adoption of this course that the justices of the appellate court should be prepared to assert that as jurors they would have rendered the same verdict. The inquiry should be whether the whole evidence presented might fairly have authorized the jury to render the verdict complained of; and justified the trial justice in sustaining it: This examination we have carefully made, and as the result we have no hesitation in deciding such evidence is found in the record.
The testimony is so voluminous that anything like a full examination would involve an expenditure of time not at our disposal. It may not be unsuitable, however, to notice briefly its application to the points at issue: The question *504 really presented by the issues sent by the Orphans’ Court, though in several forms, were; first, whether the testator-had sufficient mental capacity to make a valid will when he signed the paper writing in evidence, on the 20th of September, 1888; and second, whether the execution of that paper writing was procured by undue influence practiced upon him. There was no insistence on the part of the caveators that the execution of the paper was procured by fraud, except as fraud might be involved in the proof of undue influence; as was explained bjr the trial justice to the jury. Upon the question of mental capacity the court below, at the request of the caveatees, substantially told the jury the testator’s mental capacity was to be presumed ; that it was therefore incumbent upon the caveators to show by satisfactory evidence his inability to transact understandingly the common and ordinary affairs of life such as making deeds and contracts; and if the caveators failed to establish the want of such capacity by a preponderance of proof the verdict should sustain the will. On the request of the caveators the jury were told, if they found the testator at tire time of the execution of the will did not have sufficient mental capacity to know the extent and value of his property, and the number and names of the parties who were the natural objects of his bounty, and their deserts, with reference to their conduct and treatment towards him, and their respective necessity and interest; and did not have sufficient active memory to retain all these facts in his mind long enough to have his will prepared and executed, then they should find against the will.
The trial justice very properly explained to the jury that the instructions last mentioned, though taken from text books of authority and adopted by many courts, were not to be understood as requiring ability upon the part of the testator to recall the names of all his relatives.
Upon this point of the instruction, as thus explained by the court, besides the testimony of witnesses for the eavea *505 tors, very positive testimony tending to show his lack of appreciation of the extent and value of the property he was about to dispose of, was given by Fullerton the draftsman of the will, and by Eichhorn, the executor. The effect of t'heir testimony was to show that the testator declared, when giving instructions to Fullerton, that he desired to dispose in his will of $50,000 of notes and obligations and other personalty, and that he would make some other disposition of his real estate; while at his death shortly afterward the entire personal estate was found to amount only to $35,000. Eichhorn explains this deficiency by the suggestion that Hoover in the intervening time had given away a note for $2,000, and a parcel of land to John Humphreys, and another parcel of land to Eichhorn himself. The land first mentioned, however, had been conveyed to Humphreys before the will was made.
If this explanation be taken as correct it would appear the testator evidently possessed little more than $35,000 of personalty when he made his will; and hence overvalued his property of that description by $15,000 ; a sum amounting to nearly one-half of all his personal estate. If, on the other hand, he intended to include his real estate in the $50,000, notwithstanding his statement to Fullerton, then it appears he proceeded the next day to revoke and destroy these testamentary dispositions by conveying the remaining parcel of his real estate to Eichhorn, as if unaware he had already disposed of it to him by his will. In either view of this matter the jury might reasonably have concluded under the instructions they had received from the court, that a man of Hoover’s age, who was so forgetful and confused as to the amount and nature of his property, to so important an extent, must have been incompetent to dispose of it by will.
In the same direction is the testimony with reference to the Kibbey agreement, as it was called, respecting a valuable property near the residence of John Hoover. •
*506 In 1867, Kibbey and Hoover had entered into a contract by which, in consideration of Hoover-’s relinquishment of all interest in that property, Kibbey consented to pay Hoover an annuity of $3,200 per annum. The requisite-papers were executed, and Hoover had regularly received the annuity semi-annually since that time. It is shown, however, by the testimony of several witnesses that Hoover, about the time of making the will, and afterwards, and up-to a few weeks before his death, was possessed of the idea that he was still the owner of that property. Thomas Kirby, a witness for the caveatee, testified that in September, 1887, Hoover offered to sell him the property on ten years’ credit wdth 3 per cent, interest. That Hoover had perfectly comprehended the agreement years before is-abundantly shown, and up to that 'time he had received upwards of $60,000 on the annuity, yet Fullerton testifies that the next year, in September, 1888, when he went wdth Eichhorn to see Hoover to receive instructions as to the will, Hoover consulted him about this property and claimed he was entitled to a conveyance of it. Fullerton says he gave him the positive opinion that he had no such rights, yet Father McGfurk testified that early in the month of March, in which he died, Hoover consulted him on the subject and procured him to make a statement of his payments upon the property, claiming he had paid for it and owned it. At his request McG-urk took the statement to Mr. Morris, who, in March, 1889, gave Hoover two legal opinions that he had no rights in the property. Hoover made a similar statement to Father Walter; and Ceas proves that in the fall before he died he was at the Title Company’s office several times procuring searches to be made on the subject, evidently believing the property still belonged to him in fee. It was also, testified that Hoover had endeavored to sell the Granby Farm after he had conveyed it to Eichhorn on the 21st of September, 1888.
It is true the correctness of such of this testimony as was *507 given by the witnesses of the caveators was disputed, by the caveatees, but nevertheless the j ury had the right to believe the statement on behalf of the caveators, and might, reasonably have concluded from this testimony, supported as it was by that of the witnesses of the caveatees, that the testator when he made the will, in the words of the 4th instruction for the caveators, “ did not have sufficient mental capacity to know the extent and value of his property ; ”' or in the language of the 5th instruction, that he did not. “ then recollect the property he meant to dispose of, and did not understand the manner in which he disposed of it.”
The caveatees produced a number of witnesses whose testimony tended to sustain their contention that the testator was of sound and disposing mind at.the time of executing the will; but these were opposed by a nearly equal number whose testimony tended to sustain the opposite contention. The objection of interest can be equally applied to each group of witnesses; and whatever others, who did not see the witnesses or observe their demeanor, might conclude as to the value of the testimony, the jury who heard it all had the right to form their own opinion as-to its reliability and probative force, and to draw their own conclusions as to whether the caveators had proved by a preponderance of evidence that the testator was not legally competent to make a last will and testament when he signed the paper writing produced in evidence.
The other general .inquiry before the jury was whether the alleged bill was procured by undue influence exercised and practiced upon John Hoover, or by fraud, misrepresentation, or artifice of Eichhorn, or of others acting of their own volition or under the direction of Eichhorn.
■ The testimony adduced upon this issue covered a very large range, and evidence was admitted in behalf of the contestants as to a great variety of instances of the alleged undue influence. - To notice them,all here, even cursorily, would be to argue the case anew.
*508 We content ourselves with saying that, in our opinion, there is evidence, derived as well from the witnesses of the caveatees as from those of the caveators, from which the jury might well have found for the caveators on this issue; and which might properly have justified the trial justice in maintaining their verdict.
The same remark may be made with regard to many of the incidental points introduced into the controversy bearing upon the issues. With respect to each of these there was competent evidence adduced by the caveators to sustain their contention, and the jury had the right to weigh their evidence against that offered by the caveatees, and to render their verdict according to their honest belief as to the weight of the testimony. The question to be decided by the jury as to the competency of the testator to make a will, involved the inquiry whether he was of sufficient mental soundness to change any previously existing purpose he might have formed, if he should subsequently desire to do so. The mere fact that a will is in the direction of a preconceived purpose should have no weight, unless the testator was, a,t the time of executing the will, of sound and disposing mind; otherwise the will of an evident imbecile or madman must stand, notwithstanding it appeared, that although dictated or even written by himself when entirely competent, it had not been executed until incompetency had developed itself.
We do not mean to say that the evidence shows Hoover had really entertained, for a long time, the persistent and settled intention to devise and bequeath his estate for religious or charitable purposes, as was claimed by the caveatees. Such an intention seems inconsistent with other repeated declarations as to his purposes; as that he intended to be his own executor; that he meant to dispose of his property during his own life, or as he expressed it, “ while he was on the hoof;” that he really gave some $29,000 to John Humphreys, the husband of one of his nieces; that he had at *509 times spoken with displeasure of the priests; that he left by his will a large and indefinite legacy to Catharine Conley, who was known to have been the mistress of a wretched old man; that the large residuum of the estate under the will was- bequeathed to Eichhorn and his daugh ters; that from time to time he parted with large portions of his property to laymen on long loans, some at 3 per cent, interest, and other portions on similar loans without interest; and that he gave the remainder of the Granby Farm to Eichhorn the day after the execution of the will which would otherwise have disposed of it.
We mean only to say that this phase of the inquiry, like the others, was properly submitted to the jury for their decision upon proof that would justify them in finding for the caveators, if they believed their evidence in preference to that of the other side.
This view of the subject was expressed by this court in Stewart vs. Elliott, 2 Mackey, 316, where a motion was argued here for a new trial after a verdict below against the validity of the will of Elliott, propounded by the executor. The issues were of the same character as those presented here, and it was vigorously insisted that the verdict was the result of prejudice and was rendered upon insufficient evidence, which is the equivalent of the contention in the present case. The court below overruled the motion for a new trial, and the General Term, after expressing its approbation of this ruling, said: “ In arriving at this conclusion we have been obliged to bear in mind the well settled canons of law on the subject; that the verdict must be presumed to be right and should be sustained, if the evidence by fair construction will warrant the finding; that the fact that the trial judge is satisfied with the verdict is a circumstance entitled to great weight; that in any case the court must be satisfied there are strong probable grounds to suppose the verdict was not according to the justice and truth of the case before it will grant a new trial; and' that it *510 will not be granted where the court -can see that real and-substantial justice has been done; that where the verdict may have been reasonably influenced by questions fairly presented as to the credibility of the witnesses, the decision of the jury should be disturbed with great caution, if at all; and that our entire system of jurisprudence is based upon the idiomatic principle ‘ad quosstiorem fabti, non respondent judices.’ ”
We have adverted to the fact that this is the second verdict rendered setting aside this will.
Originally the courts declined to grant a new trial after a second verdict for the same party; but is now' settled that it may be granted if the reasons are sufficient, depending upon the circumstances of the case; although in such cases a new trial is seldom awarded, certainly with much hesitation. 3 Blacks. Comm., 387.
The Supreme Court, in Louisville & Nashville Railroad Co. vs. Woodson, 134 U. S., 623, asserts as a principle, that “ Courts rarely grant a new trial after two verdicts upon the facts in favor of the same party, except for error of law.” The rule ivould of course be different where the jury should find a second verdict against the instructions of the court, or should continue to render oppressive damages against a defendant. In 3 Graham and Waterman on New Trials, 1366, it is said: “It must be admitted, after two or more juries have arrived at the same result, a very strong presumption arises in favor of the verdict. The court will be less likely to grant a new trial after a second verdict where the judge who presided at the trial is satisfied with it.” Id., 1367.
Indeed, where the second verdict appears to have turned upon the mere weight of the evidence, and the trial justice has refused to disturb it, it seems to be generally considered' by the appellate court that no good purpose is likely to be served by sending the case back for a third hearing; and they refuse to continue the apparently hopeless litigation *511 unless the second verdict appears so plainly against .the •weight of the evidence as to creaté a strong presumption of injustice. .
In Foster vs. Alviz, 3 Bingham’s N. C., 896, the trial court granted a new trial. The second verdict was for the same party. A motion before four judges of the Common Pleas to award a third trial was overruled, Vaughan dissenting. The court relied upon Foster vs. Steele, Id., 892, in which the facts were similar. In the latter case Tindal and Park, J. J., said:
“ The verdict should not be disturbed. If a new trial should be granted, and a third verdict be given for the plaintiff, the same arguments might he urged for granting a fourth trial; and so superceding the functions of the jury, and leading to endless litigation. Although the verdict might not be altogether satisfactory, the court ought not, unless in a case- of perverseness, to disregard the opinion of twenty-four jurors, highly conversant with the matter in dispute.”
In the case before us, there is no ground whatever appearing in the record for supposing a third jury would decide differently from its predecessors; and, such evidently was the opinion of the trial justice.
There is a marked difference in the action of appellate courts in cases where the appeal is from a ruling of the trial judge setting aside a verdict and granting a new trial; and in cases where the trial judge has refused to interfere with the second verdict. To the former class belong several of the cases cited by the appellants: Taylor vs. RR. Co., 79 Ga., 330; Davis vs. Roper, 33 Eng. L. & E., 511; Means vs. Means, 6 Rich., S. C., Law, 1. In 79 Georgia, the appellate court, though approving of the action of the trial judge in granting a new trial, declared that “ after one grant of a new trial, a subsequent grant on account of a supposed conflict between the verdict and the evidence will be closely scrutinized by the appellate court to see that the discretion *512 of the court has been justly and wisely exercised in view of the peculiar issues and facts of the case, and having due-regard to the general consideration of the fitness of juries to ascertain facts, and of the necessity that there must be some end of litigation.”
In a case of the second description, Christian vs. Westbrook, 75 Ga., 853, where the lower court had refused to set aside a second verdict for the plaintiff, the court of appeals declined to interfere with this exercise of his discretion by the trial judge; although it pronounced the evidence introduced to establish the main ground relied on for a recovery to be “ rather weak.”
In announcing our conclusion that the verdict should not be disturbed, we are not to be understood as adopting-the contention of the caveators, that the testimony establishes the charges of active interference by the parties against whom such evidence was directed. We content ourselves with declaring, as we did in Johnson vs. Railroad,. 6 Mackey, 244, that we see nothing in the record to induce us to say there was error on the part of the trial justice in refusing to disturb the verdict of the jury.

The rulings of the Circuit Court are affirmed.